**Lisa FLEETWOOD o/b/o C.F., Plaintiff,**

v.

**Carolyn W. COLVIN, Commissioner of Social Security, Defendant.**

**C.A. No. 14–331–M–PAS.**

United States District Court, D. Rhode Island.

Signed May 11, 2015.

David B. Green, Green & Greenberg, Providence, RI, for Plaintiff.

Zachary A. Cunha, Office of the U.S. Attorney, Providence, RI, for Defendant.

*MEMORANDUM AND ORDER*

JOHN J. McCONNELL, JR., District Judge.

Before the Court is Plaintiff Lisa Fleetwood's Motion to Reverse and/or Remand the denial of her minor child C.F.'s application for Supplemental Security Income

("SSI") under the Social Security Act ("the Act"). (ECF No. 8). Carolyn W. Colvin, Commissioner of Social Security, moves to dismiss, arguing that the Administrative Law Judge ("ALJ") correctly rejected the minor child's application. (ECF No. 14). Because the Court finds that the ALJ's finding is not supported by substantial evidence in the record, it reverses his decision and remands for further proceedings.

## I. FACTS

C.F. was born in October 2002. He is twelve years old. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and a learning disorder, noted in his medical records as early as 2009. (Tr. at 302–304). His Global Assessment of Functioning ("GAF") at discharge from Gateway Healthcare, Inc. in March of 2012 was only 49.[1] Dr. Henry Mann, his treating physician, noted on February 20, 2012 that C.F. has bipolar disorder, ADHD, and marked learning problems. (*Id.* at 220). He noted that he is depressed and feels hopeless, with the background stressor being school. (*Id.* at 389). In November 2012, Dr. Mann wrote a letter of support for C.F., in which he noted, "[b]ecause of the nature of his disability, bipolar disorder, he may be highly reactive to certain kinds of provocations including that of being teased and demeaned by his peers." (*Id.* at 482). · C.F. was prescribed various medications, home therapy, and counseling to attempt to address his disability. (*Id.* at 351–375). In January 2013, as Dr. Mann continued to search for the right medication for C.F., he wrote, "[g]iven the significant amount of pressure on (C.F.) with his learning disabilities and the pressures at school . : . .it is hard to imagine that we can reach an ideal state of mood stabilization." (*Id.* at 483).

C.F. also received treatment from several therapists and clinicians at Family Solutions and The Kent Center for his ADHD and mood disorders, (*Id.* at 351–375, 412–481). He made slow progress at Family Solutions in reducing impulsive behaviors and improving socialization. (*Id.* at 408–411). Mary Jean Zaroogian at The Kent Center noted in January of 2013 that C.F only made minimal progress in managing his behavior and mood. (*Id.* at 489).

Ms. Fleetwood filed an application for Supplemental Security Income ("SSI") under the Act on behalf.of her son with an alleged disability onset date of October 19, 2010 when he was eight years old. (*Id.* at 11, 115–123). In his application, he listed severe attention deficient hyperactivity disorder (ADHD), bipolar, and mood disorder as his disabilities. (*Id.* at 138). Following the denial of her claim both initially and on reconsideration, Ms. Fleetwood requested a hearing before an ALJ, which was held on January 28, 2013. (*Id.* at 11). By the time of the ALJ hearing, C.F. was ten years old and in the fourth grade. He was receiving failing grades and failed the second quarter of his fourth grade year. (*Id.* at 42). Ms. Fleetwood appeared at this hearing with counsel, and offered her own testimony. (*Id.* at 11).

The ALJ found in a February 15, 2013 decision that C.F. had the severe impairments of ADHD, learning disorders, mood disorder, and bed-wetting, but that he was not disabled, denying his application. (*Id.* at 11–26). Ms. Fleetwood sought review before the Appeals Council. ·Her appeal was denied, rendering the ALJ's determination the final decision of the Commissioner. (*Id.* at 3–5). This action followed.

The Court has jurisdiction under 42 U.S.C. § 405(g) to review the ALJ's deci-

---

1. A GAF of 41–50 indicates "serious symptoms ... or any serious impairment in social, occupational, or school functioning) ..." *Di-* *agnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text revision, (DSM–IV–TR), 34 (4th ed.2000).

sion. The single question in this appeal is whether the ALJ erred in finding that C.F. was not disabled because he did not have a marked limitation in attending and completing tasks.

## II. *STANDARD OF REVIEW*

■ Review of a final decision of the Commissioner is authorized by 42 U.S.C. § 405(g), which provides the Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." If any finding is "supported by substantial evidence" it shall be "conclusive." *Id.* The findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999). If the Court finds that the ALJ has erred, it may award benefits or affirm a denial of benefits. *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir.2001) "If an essential factual issue has not been resolved ... and there is no clear entitlement to benefits, the court must remand for further proceedings." *Id.*

The First Circuit Court of Appeals has stated that the Commission should ensure that a just outcome is achieved in Social Security disability claims, since the Social Security Act is remedial legislation to be construed liberally to achieve its purpose of easing the insecurity of life. *Pelletier v. Secretary*, 525 F.2d 158, 161 (1st Cir.1975); *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir.1965). "[T]he law was not intended to deal injustices to a needy petitioner in social security cases." *Miller v. Harris*, 490 F.Supp. 1184, 1186 (W.D.Pa.1980). A claimant need not prove his case beyond a reasonable doubt, *Ziskin v. Weinberger*, 379 F.Supp. 124, 128 (S.D.Ohio 1973). "The broad purpose of the Act requires a liberal construction in favor of disability and the intent of the Act is inclusion rather than exclusion." *Black v. Sullivan*, 793 F.Supp. 45 (D.R.I.1992) (citing *Rivera v. Schweiker*, 717 F.2d 719 (2d Cir.1983)).

## III. *THE APPLICABLE DISABILITY STANDARD FOR MINOR CLAIMANTS*

In order for a child to be found disabled and entitled to SSI benefits, it must be shown that the child meets the standards set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193 (the "PRWORA"). The PRWORA provides that:

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

*Id.* at § 211(a)(4).

In response to the PRWORA, the Commissioner established a three-step protocol for determining whether a child under age eighteen is disabled. *See Beliveau v. Apfel*, 154 F.Supp.2d 89, 93 (D.Mass.2001) (citing 20 C.F.R. § 416.924). At step one, the Commissioner must determine whether the child is engaging in "substantial gainful activity." *Id.* (citing 20 C.F.R. § 416.924(b)). If not, the Commissioner proceeds to step two, and must determine whether the child has an impairment or combination of impairments that are "severe." *Id.* (citing 20 C.F.R. § 416.924(c)). At step three, the Commissioner must determine whether the severe impairment meets, medically equals, or functionally equals an impairment listed in the "Listing of Impairments" from Appendix 1 of Sub-

part P of the Commissioner's regulations. *Id.* (citing 20 C.F.R. § 416.924(d)). An impairment medically equals a listing if "it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Conversely, functional equivalency may be measured in "domains," which include:

1. acquiring and using information,
2. attending and completing tasks,
3. interacting and relating with others,
4. moving about and manipulating objects,
5. caring for oneself, and
6. health and physical well-being.

*See* 20 C.F.R. § 416.926a(b)(1).

To qualify as functionally equivalent to a listing, the child's impairment "must result in [either] 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The child has a "marked" limitation—i.e., one "that is 'more than moderate' but 'less than extreme' "—when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). The child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## IV. *THE ALJ'S DECISION*

At step one, the ALJ found that C.F. had not engaged in substantial gainful activity during the period covered by the application filed on his behalf. (Tr. at 14).

At step two, the ALJ found that C.F. had the severe medically determinable im-pairments of ADHD, learning disorder, mood disorder, and bed wetting. (*Id.*).

At step three, the ALJ found that C.F. did not have an impairment or combination of impairments that met or medically equaled a listing. (*Id.* at 18). The ALJ further found that C.F. did not have an impairment or combination of impairments that functionally equaled the severity level required by the listings. (*Id.* at 18–26). Specifically, the ALJ found that C.F. had:

1. a marked limitation of interacting and relating with others (*id.* at 23);
2. a limitation, but less than marked, of acquiring and using information, of attending and completing tasks, and of caring for himself (*id.* at 21–23, 24–25); and
3. no limitation of moving about and manipulating objects, or of health and physical well-being (*id.* at 24, 25–26).

The ALJ further stated that C.F.'s medically determinable impairments could reasonably be expected to produce some symptoms of the type alleged, but that Ms. Fleetwood's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible in light of the record evidence. (*Id.* at 19–20).

The ALJ found C.F. not disabled and denied Ms. Fleetwood's application for SSI for C.F. because he had only one "marked limitation" from the six domains, and not the required two. (*Id.* at 26). The ALJ based his finding that C.F. did not have marked limitations in attending and completing tasks on the fact that C.F. had been promoted annually and had made "some progress" at school.[2] (*Id.* at 22–23).

---

**2.** The ALJ's concluding paragraph in both the acquiring and using information and the attending and completing tasks sections, after he determines that C.F. has a less than marked impairment, are identical. He bases both conclusions, despite the fact that each domain has different considerations, on the fact that C.F. has never been held back and he has made some progress according to school records.

The ALJ accounts for C.F.'s difficulties in this area by finding that they are directly related to the fact that he had just changed schools, his third school in his academic career. (*Id.* at 18).

## V. ANALYSIS

Ms. Fleetwood argues that the ALJ's conclusion that C.F. did not have marked limitation in attending and completing tasks was not supported by or based on substantial evidence in the record because the state agency psychologist he relied on, Dr. Clifford Gordon, did not review current and relevant medical, psychological, and educational evidence in rendering his opinion, Also, Ms. Fleetwood argues that, because the ALJ did not have medical opinions on this current and relevant evidence, he erroneously interpreted this raw data from the evidence without the assistance of a medical expert.

The Court notes at the outset that the ALJ's decision seems internally inconsistent and fails to address significant evidence in the record. Specifically, it is inconsistent in that the ALJ found that C.F. has severe ADHD, but then went on to conclude that he did not have a marked limitation in his ability to complete and attend to tasks. There is nothing in the ALJ's decision that acknowledges or explains this disconnect between clinical diagnosis and disability limitation. Perhaps it is because the ALJ gave significant weight to an agency opinion made in the absence of the full record.

Dr. Gordon issued his opinion in January 2012. (*Id.* at 66–75). He determined that C.F. had severe ADHD, learning disorder, and mood disorders, resulting in a marked limitation in the area of interacting and relating with others, but found a less than marked limitation in the other areas, including the one that Ms. Fleetwood raises herein, attending and completing tasks. (*Id.* at 66, 71–72). Specifically,

Dr. Gordon focused on Dr. Mann's conclusion from August 2011 that C.F. was not disabled and an October 2011 note based on subjective reports (presumably from Ms. Fleetwood) that C.F. was doing extremely well in school with very good grades. (*Id.* at 68).

■ Dr. Gordon, however, did not review any educational records at all in rendering his opinion and did not see any medical records after January 2012, specifically records from the Cranston School Department (*id.* at 170–301, 401–411), The Kent Center (*id.* at 412–481, 489), CCAP Family Health Services (*id.* at 484–488), and Quality Behavioral Health (*id.* at 389–400, 482–483). "It can indeed be reversible error for an administrative law judge to rely on an RFC opinion of a non-examining consultant when the consultant has not examined the full [ ] record." *Strout v. Astrue*, Civil No. 08–181–B–W, 2009 WL 214576, at *8 (D.Me. Jan. 28, 2009) (citing *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)). "However, an ALJ may rely on such an opinion where the [ ] evidence postdating the reviewer's assessment does not establish any greater limitations, ..., or where the [ ] reports of claimant's treating providers are arguably consistent with, or at least not 'clearly inconsistent' with, the reviewer's assessment." *Ferland v. Astrue*, No. 11–cv–123–SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (internal citation omitted).

■ In this case, though, even if the newer medical records were not clearly inconsistent, the fact that Dr. Gordon rendered opinions on domains that clearly impact school performance without reviewing a single school record is troublesome. This is especially so since Dr. Gordon found that C.F. had severe ADHD, learning disorder, and mood disorder—disabilities that manifest themselves in the classroom environment. If Dr. Gordon looked

at the school records, he would have learned:

- On February 20, 2012, Dr. Mann wrote a letter in support of C.F. to the school, noting that the background stressor in C.F.'s life is that he feels hopeless about school and about himself. (Tr. at 220);
- In a March 21, 2012 Functional Behavioral Assessment Report, it was noted that C.F. "will not initiate work without adult supervision even when capable of assignment." (*Id.* at 257);
- A December 19, 2012 Functional Behavioral Assessment Report from C.F.'s school team noted that he becomes withdrawn and sullen when told he may not do something, causing him to refuse to speak and hold his head down in class for thirty minutes to an hour or more. (*Id.* at 221). He is inattentive, non-compliant, alienated from his peers and has a limited ability to manage frustration. (*Id.*). These professionals note that Dr. Mann believed that C.F.'s behavior is related to his bipolar disorder. (*Id.*). They also note that he shows a decrease in independent behavior in the form of over reliance on his classroom teacher. (*Id.*);
- C.F.'s teacher completed an Interim Report in January 2013 that showed he was failing tests and/or written work and his progress in reading, writing, math, and social studies was less than satisfactory. (*Id.* at 279);
- In a January 2013 IEP Progress Report, it was noted that C.F. was making minimal progress in organization, specifically he was "learning to use a daily checklist to assist with organization, [but he] continues to require reminders to take out the appropriate materials needed to complete assignments, initiate tasks, and complete assigned tasks." (*Id.* at 299);

- In his IEP for the 2013–2014 academic year, it was noted as a need that C.F. "has difficulty initiating and completing assigned tasks with independence. He needs adult prompts to see tasks through to completion. He scores 2 out of 10 on the sigma rubric for organization." (*Id.* at 282);
- During an educational evaluation in March of 2012, C.F. "responded very slowly and hesitantly to test questions, and he gave up easily after attempting difficulty tasks, even with consistent positive praise." (*Id.* at 243). His teacher reported that he "has a very hard time with all of his basic skills and frequently seeks and asks for help," and that he needs assistance to initiate and complete most work. (*Id.* at 249);
- In 2013, Dr. Mann said that C.F. is not completing his work. "At school when he does not understand something he shuts down and that it takes a teacher between a half hour and an hour to get him to get him to get back online and cooperate with learning." (*Id.* at 483).

These records present significant evidence of his limitations directly from C.F.'s educational and medical team. These limitations relate to C.F.'s inability to "independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), and are examples of difficulties that a child can have in attending to and completing tasks provided in 20 C.F.R. § 416.926a(h)(3) and SSR 09–4p such as becoming sidetracked, easily frustrated and giving up on tasks, interrupting others, requiring extra supervision, and not being able to plan, manage time or be organized in order to complete assignments on time.

But, the ALJ appeared to ignore this significant evidence in favor of Dr. Gordon's conclusion that C.F.'s limitations in

attending to and completing tasks were less than marked. This is so even though the educational and psychological records were consistent with C.F.'s diagnosis of ADHD and his difficulties in that domain. Moreover, the Court is not confident that, had Dr. Gordon seen the school and updated medical evidence, he would have persisted in his opinion that C.F. did not have a marked limitation in attending and completing tasks, *Alcantara v. Astrue,* 257 Fed.Appx. 333, 334 (1st Cir.2007) (where the state agency doctor has none of the current records before he opined, the ALJ should not have considered his opinions as substantial evidence). If Dr. Gordon concluded that C.F. did have marked limitations in attending to and completing tasks based on the full record, the ALJ's conclusion may have been different as well.

Additionally, the ALJ not only impermissibly relied on an opinion that was not based on substantial evidence, but he also ignored an enormous amount of evidence that could support a finding of a marked limitation in the domain of attending to and completing tasks. Some of that evidence from his school and Dr. Mann was listed above, but there is also Ms. Fleetwood's own testimony at the hearing. She testified that C.F. has reading and comprehension difficulties, does not understand what he reads, and needs teachers to read materials to him in order to understand (tr. at 42); has difficulty competing assignments, such as book reports and reading books (*id.* at 52–53); has trouble paying attention and gets very distracted, and requires one-on-one help from his mother (*id.* at 53); has difficulty transitioning between tasks, mostly because he does not understand the materials (*id.*); shuts down at school (*id.* at 55); and has difficulty handing in homework and completing tasks. (*Id.*) The ALJ discounted this testimony, finding that Ms. Fleetwood's statements about her son's symptoms were not credible and not based on substantial evidence in the record. (*Id.* at 19–20). Dr. Gordon, whose opinion the ALJ relied on significantly, disagreed, finding those statements to be substantiated by the evidence. (*Id.* at 72). Nowhere in his decision does the ALJ square his disagreement with Dr. Gordon on Ms. Fleetwood's credibility or say why he chose to disregard Dr. Gordon's assessment of credibility.

■ The ALJ did have the school records and updated medical records and did consider them in making his decision that C.F. was not disabled. However, without the benefit of an expert or reviewing psychologist, the ALJ interpreted the school record evidence himself—that is impermissible under the regulations. *Alcantara,* 257 Fed.Appx. at 334 ("Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion."). Because the ALJ made judgments on issues that require an expert's opinion, such as the psychological issues present in C.F.'s case, his factual findings on the school records are not conclusive. *See Nguyen,* 172 F.3d at 35. Therefore, the Court remands the case for another review in light of all of the above, and so that a medical expert can review the school and updated medical records and give a thorough assessment of C.F.'s limitations based on his entire record.

## VI. CONCLUSION

Ms. Fleetwood's Motion to Reverse and/or Remand is GRANTED (ECF No. 8) and the Commissioner's Motion to Affirm is DENIED. (ECF No. 14).

IT IS SO ORDERED.